# Birmingham Furnace & Manufacturing Co. *v.* Gross, Adm'r.

*Action by Administrator of Employe for Injuries Causing Death.*

1. *Plea of contributory negligence must aver that it contributed to the injury.*—A plea that plaintiff's intestate was guilty of contributory negligence, failing to aver that such negligence contributed proximately to the injury, is insufficient on demurrer.

2. *Amendment of complaint within lis pendens.*—A complaint containing several counts alleging that the death of an employe was caused by the negligence of defendant, which negligence is charged in varying forms, may be amended by adding counts which allege that the acts being done by the intestate at the time he was killed, were done in conformity to the orders of a person to whose orders he was bound to conform, and the plea of the statute of limitations is no answer to such amendments when it appears that the same acts are described in all the counts of the complaint.

3. *When general affirmative charge should be given.*—When there is no evidence tending to support the allegations of a count in a complaint, it is error to refuse the general affirmative charge for the defendant as to such count, when requested in writing.

4. *Plaintiff cannot complain of the consequences of his own act.*—Where the plaintiff counts on the negligence of the defendant in closing the gas escape and the proof shows that it was closed by the plaintiff's intestate himself, there can be no recovery on such count.

5. *Defects must be in part of the works.*—When the plaintiff counts on

[*Birmingham Furnace & Manufacturing Co. v. Gross, Adm'r.*]

an alleged defect in the ways and works of the defendant, and the proof shows that the alleged defect consisted in providing a ladder instead of a platform on which to stand while making some repairs near the top of a tall chimney, there can be no recovery on such count, since such ladder was not a part of the plant, nor a defect therein.

6. *Contributory negligence bars recovery* —If in such case it is shown that the injured employe was himself the master-mechanic entrusted by the defendant with the duty of seeing that its ways and works were in proper condition, and that he provided the ladder so as to reach the place to make the repairs, there can be no recovery.

7. *Evidence relevant to prove authority* —In an action to recover damages for the death of a master-mechanic of a furnace plant, alleging that it was caused by the negligence of the foundryman of such plant, testimony of the duties and authority usually exercised by persons holding similar positions, is admissible.

8. *Expert opinion admissible.* —A witness who has worked in iron furnaces four or five years is properly allowed to state that in his opinion, some men can stand more gas than others.

9. *Evidence as to employee's knowledge of dangers.*—It being shown that the deceased employe was injured while repairing a defective bleeder in a furnace, testimony tending to show that he had previously spoken of it as disturbing his sleep by its noise, and that he had stated that he had been a long while in the furnace business, is admissible.

APPEAL from City Court of Birmingham.

Tried before Hon. W. W. WILKERSON.

The complaint as originally filed contained six counts. By amendment two counts (7 and 8) were added to the complaint. The defendant demurred to these counts on the ground that they were barred by the statute of limitations. This demurrer was overruled. The defendant demurred to the several counts of the complaint. The demurrer to the fifth count was confessed by the plaintiff, and said count was stricken from the complaint. The other demurrers were overruled. The defendant pleaded the general issue and contributory negligence. The third plea was in the following language: "And for further answer to said complaint the defendant says that plaintiff's intestate was guilty of contributory negligence." The plaintiff demurred to this plea on the ground that it was too general and indefinite, and did not state the facts which constitute contributory negligence. This demurrer to the third plea was sustained. The defense of contributory negligence was set up by other pleas.

On the trial the witness Middleton, stated that he had been in the furnace business four or five years, and he was permitted to testify, against the defendant's objection, that some men could stand more gas than others. The other facts sufficiently appear in the opinion.

[Birmingham Furnace & Manufacturing Co. v. Gross, Adm'r.]

E. K. CAMPBELL, for appellant, insisted that under the facts of this case, the general charge ought to have been given, citing *Smith's case*, 88 Ala. 538; *Nolan v. Shickle*, 69 Mo. 336; *Orr's case*, 91 Ala. 548; *Walters' case, Ib.* 435; *Hall's case*, 87 Ala. 720; *L. & N. R. R. v. Crawford*, 89 Ala. 245; *M. & B. Rwy. v. Holborne*, 84 Ala. 135. As to evidence of authority of foundry-boss and master-mechanic at other furnaces, 1 Gr. Ev. 53; *Hissong's case*, 91 Ala. 514; *Thrash v. Bennett*, 57 Ala. 16.

LANE & WHITE, for appellee, contended that the danger was not apparent, citing *R. R. v. Orr*, 91 Ala. 548; *H. A. & B. R. R. v. Wallace*, 91 Ala. 435; *Western Rwy. v. Bridges*, 86 Ala. 448; that the general charge for defendant should not have been given, *Leach v. Bush*, 57 Ala. 145; *Seale v. Edmundson*, 73 Ala. 295, and numerous authorities.

HEAD, J.—Under the decisions of this court the second count of the complaint sets forth with sufficient certainty a cause of action under subdivision 1 section 2590 Code, and the demurrer to it was properly overruled.

The third plea was manifestly bad. It states simply that plaintiff's intestate was guilty of contributory negligence, without averring that such negligence contributed proximately to the injury. The demurrer was properly sustained.

The demurrers to the pleas of the statute of limitations to seventh and eighth counts which were introduced by amendment were properly sustained. The matter introduced by the new counts was within the *lis pendens.—A. G. S. R. R. Co. v. Chapman*, 83 Ala. 453.

This is an action under the Employer's Liability Act against the appellant for negligently causing the death of appellee's intestate, Julius N. Weiss. The appellant was engaged in operating an iron furnace and Weiss was engaged as its master-mechanic whose duty was to see that the furnace and all its machinery were kept in proper repair and condition. One Thompson was foundry-man and had general charge and control of the operation of the furnace. P. Hogsett was the general manager of defendant, having the superior control and management of its business generally. In operating the furnace, air is forced by the engines in pipes through what are called the stoves and thence into the furnace, making the blast. The air enters near the base of the furnace and blows towards the top. This forces the smoke and gas through the top of the furnace, if the

[Birmingham Furnace & Manufacturing Co. v. Gross, Adm'r.]

contrivance in the furnace called the "bell" is open (lowered). If the "bell" is closed (raised) the smoke and gas escape by means of a large pipe, three or four feet in diameter, called the "*downcomer*," which is attached to the furnace near its top and extends downwards connecting with the stoves and boilers by means of flues. When the gas reaches the stoves it is burning and serves to heat to a high degree the cold air forced into the stoves, and this hot air passes into the furnace and makes the blast. - When the gas reaches the stoves through the downcomer there are valves called "chimney-valves" through which the gas and smoke pass and are liberated through the smoke-stack. The smoke-stack at defendant's furnace is about 140 feet high. Attached to the "downcomer" near where it is connected with the furnace, is a cylinder about 32 inches in diameter called the "bleeder." This bleeder extends directly upward to the height of about 12 feet above the top of the furnace, and its use is to act as an escape-valve in case the downcomer gets too full of gas. When that is the case the gas flows into and fills the bleeder. The bleeder is surmounted by a heavy iron cap called the damper weighing 200 or 300 pounds. This damper is raised to allow gas to escape from the bleeder by means of a lever attached to it which works on a bolt through the arm of the lever. The arm extends out horizontally several feet. At its end furthest from the damper is a chain extending to the ground by means of which the damper is raised and the bleeder opened by workmen below. The top of the furnace near where the bleeder is attached to the downcomer is about 18 feet in diameter, a part of which is taken up with a platform about four feet wide on which the men feeding the furnace run the cars of ore and coke. Here a solid railway of iron about 4 feet high surrounds the furnace. The edge of the bleeder is about six inches from the edge of this railing.

It was shown that sometimes when the furnace was in operation the weight of the chain suspended from the arm of the lever above referred to would raise the damper at the top of the bleeder and cause the gas to escape and produce a disagreeable noise; and sometimes the force of the gas flowing from the downcomer into the bleeder would produce a similar result. This noise was very disagreeable to the persons about the furnace, though it did not impair in any way, the operation of the furnace. Weiss complained that it interrupted his sleep at night. The deceased, Weiss, and foundryman, Thompson, had, within a period of a month or more before Weiss was killed, talked about the noise, and

Weiss had several times remarked that the first time the furnace stopped he was going to remedy it; and it was suggested that it could be done by shortening the arm of the lever. On the 17th day of June 1887, Thompson stopped the furnace three or four hours to enable him to repair some of the valves on one of the stoves, and when it stopped, Weiss, aided by some of the furnace laborers, went up to the bleeder to remedy the defect which caused the noise. They reached the arm of the lever at the top of the bleeder by means of ladders which they rested on the platform above described and leaned against the bleeder. The ladders were held firmly by some of the hands, so that they could be safely ascended. Weiss, with assistance of the hands, ascended to the arm of the lever, took it off and sent it down to the blacksmith shop where it was, in a short while, shortened by the smith and sent back. Weiss then, with like assistance, carried it up to its place, properly adjusted it, and as he was in the act of putting in a key to hold it in place, remarked, "I can not stand it up here," and started down the ladder, and as he made the first step fell to the ground, a distance of some eighty feet, and was killed. There was evidence tending to show that gas was then escaping from the bleeder and that he was affected and caused to fall by it. After Weiss had first ascended to the top of the furnace and before he took the arm of the lever off he called down to Thompson, who was then working on the valves he had stopped the furnace to repair, to know if he, Weiss, might close the bell in the furnace, and Thompson replied that he might. The bell was then open and could be closed only by appliances operated at the top of the furnace where Weiss then was. Weiss had no authority to close the bell, without Thompon's permission, and obtaining that permission he closed it, and proceeded with his work. It required about 20 minutes to take off the arm of the lever and about as long to replace it. There was evidence tending to show that when the bell and the chimney valves below were both closed the gas would fill the bleeder, and when the bell or the valves were open the gas would find escape in other ways and not fill the bleeder. It was shown however that under all conditions some gas would go into the bleeder and was likely to escape therefrom at any time to a greater or less extent. Weiss was an old and experienced master-mechanic, knew all about the construction of furnaces and the accumulation of gas and its different means of escape under the different conditions. Thompson was likewise experienced as a found-

[Birmingham Furnace & Manufacturing Co. v. Gross, Adm'r.]

ryman and possessed like knowledge in reference to gas. The evidence was without conflict that Weiss had exclusive control of the mechanical department, that. in keeping the plant and machinery in order he had command · of the necessary materials supplied by the company and of the carpenter and other laborers employed there whenever their aid was necessary in the performance of his duties as master mechanic. He was the only person skilled in his department, and of the manner and means of performing his duties he was complete master, subject, in respect thereto, to the orders of no superior. There was considerable evidence touching the subject of Thompson's authority to give him orders and directions. We have carefully examined that testimony and find that its unquestionable effect (not mere weight) is that when Thompson, as foundryman, charged with the operation of the furnace, found any repairs or improvements of the machinery or plant, coming within the mechanical department, necessary to be done or made, he had a right to call on Weiss to do it and it was Weiss' duty to obey, but as to the execution of the work Thompson had no authority or control. It was Weiss' province to command the material and labor and do the work according to his own judgment and direction in so far as they did not conflict with the authority of the operating department which was vested exclusively in Thompson. Thompson had no right to direct Weiss as a mere subordinate. Each was supreme and of equal degree in his peculiar department. Neither possessed the skill requisite to the position of the other.

With this outline, let us see what the issues are as presented by the pleadings. The action is under the Employers Liability Act. Counts 1, 2, 3, 4, 7 and 8 of the complaint are relied on. The first, fourth and seventh counts are framed under subdivision 3 of section 2590 of the present Code. The first alleges that Thompson, to whose orders intestate was bound to conform, negligently ordered intestate to ascend to the top of the furnace stack and shorten the lever of the bleeder to prevent the gas escaping from thebleeder; that the bleeder was in an unsafe and unsound condition in this that gas was escaping therefrom which was caused by the negligence of Thompson in not closing the bell at the top of the furnace, but negligently allowed it to remain open when the intestate was ascending or had ascended near the top of the furnace stack ; that intestate was overcome and caused to fall and be killed by the escaping gas. The fourth count is substantially the same as the first. The seventh

15-97

count is the same as the first except that it avers that the escape of gas from the bleeder was caused by the negligence of Thompson in not closing the bell and not opening the chimney valves and thereby preventing the gas flowing into the bleeder. Each of these counts alleges that the injury resulted from intestate's having conformed to the said orders of Thompson.

Is there any evidence tending to support these counts? When the plaintiff closed his evidence, no testimony whatever had been given touching the subject of any order given by Thompson to Weiss in the premises. When Thompson took the stand as a witness for defendant, plaintiff examined him on the subject, and he testified positively and fully that he gave Weiss no order whatever to go up and fix the bleeder and that he did not know he had ascended the furnace until he called down to him for permission to close the bell. Wm. Etheridge one of the laborers was introduced by defendant, and on cross-examination he testified, after stating that he and other laborers were with Weiss on the furnace, fixing the arm of the lever, *"that Thompson knew they were on the furnace and told them to fix the lever."* This statement of the witness Etheridge is the only evidence which it can be urged tends to show an order given by Thompson to Weiss. It may be seriously doubted under our rulings whether the statement tends to prove the order alleged in the complaint —whether the jury could legitimately conclude from it that Thompson ordered Weiss to ascend to the top of the furnace and fix the lever, at the time he did so ascend. In *M. & O. R. R. Co. v. George*, 94 Ala. 199 ; s. c. 10 So. Rep. 145, we ruled that the orders mentioned in the statute "evidently refers to special orders and directions in respect to the particular service in which the employe is engaged, at the time of the injury, as distinguishable from a general order or direction in reference to the discharge of his general service growing out of the nature and scope of his employment. ·  ·  ·  ·  There being no evidence that the yard-master gave plaintiff any order or direction to uncouple the car from the engine, *at the time of his injury*, he has failed to establish one of the essential statutory propositions." It is manifest that to come within the statute, the order must be such as implies requirement of obedience at once, or under conditions existing or in contemplation of the person giving the order when it is given, for it is, necessarily, by the conditions existing or in contemplation at the time the order is given, that the question of negligence *vel non* in giving it is to be determined. The statement of the witness is extremely vague

and indefinite. He does not show when Thompson "told them to fix the lever," whether at the time the work was undertaken or a day, a week or a month before. But pretermitting that question, and assuming that Thompson did then give the order, there is not, under the undisputed evidence, a single attribute of negligence, on his part, in giving it. We have seen that Weiss was the master-mechanic, and as such, had complete mastership over the ways and means of executing the duties of his position; and possessing peculiar skill and knowledge in reference to the construction of furnaces and the flows and escapes of gas, knew perhaps more than Thompson could know, the conditions existing when he undertook to fix the lever, and what conditions were essential to safety in the performance of his work. He found it necessary, as the proof shows, to close the bell, and, obtaining Thompson's permission, closed it. He ascended to the arm of the lever, took it off and came down. If gas was then escaping from the bleeder so as to endanger him, he knew it better than Thompson could possibly have known it. The proof is undisputed that Thompson did not know gas was then escaping further than such knowledge might be imputed to him from his general knowledge that it was liable to escape at any time. Thompson as a prudent man had a right to rely upon this superior knowledge of Weiss and Weiss' exclusive control over the ways and means of executing his work. But it is said that Thompson was negligent in allowing the chimney valves below to be closed, which had the effect of forcing the gas into the bleeder when if they had been open it would have found escape elsewhere. The proof is undisputed that when the furnace was running the valves were always open, and were never closed when the furnace was stopped for only a few hours, as in the present instance. When Weiss fell it had been stopped about one and one-half hours. The proof is undisputed that if the valves were closed by any one after the furnace stopped Thompson did not know the fact. The chimney valves were on the opposite side of the stoves to where Thompson was at work on a stove valve, and he could not see them. He swears the stove valves in his sight at the time were open. There was nothing whatever to create an apprehension in his mind that the chimney valves were closed and he had every reason to believe that they were open. Indeed there is no direct proof that they were closed. No witness testified to it. It is argued that they were from the fact that when open the tendency is to draw the gas from the bleeder and that on this occasion gas escaped from the bleeder;

wherefore the inference that the chimney valves were closed. Viewing these relations of the parties to each other, to the furnace and to the particular work in hand we unhesitatingly declare that there is not the slightest ground for imputing negligence to Thompson in telling *"them to fix the lever."* The general charges requested by the defendant upon the first, fourth and seventh counts ought to have been given.

The 3rd and 8th counts will have to be similarly disposed of upon the same principle. These counts aver, under the statute, that Thompson had superintendence entrusted to him and was negligent in the exercise of such superintendence in that, as charged in the 3rd count, knowing intestate was at work on the said lever, &c., allowed gas to escape from the *furnace stack*, in large quantities, by not closing the bell at the top of the furnace; and as charged in the 8th count, knowing intestate was at work on the lever, &c., negligently failed to open the chimney valves of said furnace and to close the bell of said furnace stack whereby gas escaped from the furnace stack and bleeder. It is manifest the charge of negligence in the third count that Thompson did not close the bell is not sustained for the bell was closed by Weiss himself by Thompson's permission, and remained closed during the whole time Weiss was at work on the lever. It is manifest also that if Weiss was suffocated by gas it was gas escaping from the bleeder and not the furnace stack as alleged. To sustain this count it was clearly necessary to prove these allegations as well as to show there was negligence on Thompson's part in respect to them. So also, in the 8th count the same allegations are made in conjunction with the further fact alleged that Thompson negligently failed to open the chimney valves, and being so alleged it was likewise necessary to prove them. But assuming the allegations to correspond with the evidence we hold, as above declared, that Thompson was guilty of no negligence, in the premises.

The second count alleges, under the statute, that the death was caused by a defect in the ways, works, machinery and plant of the defendant, in that the defendant had no platform or other safe or suitable contrivance around the bleeder upon which intestate could stand or sustain himself while at work on the bleeder and lever; and that the defect arose from and had not been discovered or remedied owing to the negligence of the defendant, or its superintendent, John Hogsett, who was in the service of the defendant, and entrusted by it with the duty of seeing that the bleeder, &c., were in proper condition. We do not think it can be seriously con-

tended that this count finds any support in the record. It is shown by all the testimony on the subject that no such thing as the maintenance of a platform around the bleeder was ever known or heard of in the construction and maintenance of furnaces. It is shown that sometimes when repairs of the bleeder are to be made the mechanic will erect or cause to be erected a temporary scaffold or platform to stand on while making the repairs; and it is also shown that such repairs are very often made by means of ladders without a scaffold—the means adopted by Weiss in the present instance. Some of the evidence tends to show that the former and some that the latter method of preparation for the work is the safer and better. It is too plain for argument that a failure to provide such temporary scaffold for executing a particular repair does not constitute a defect in the ways, works, &c., within the contemplation of the statute. As well might it be argued that the failure to furnish the proper tools and implements for doing the work constitutes such a defect. As we have said some of the evidence tends to show that ladders are the better and safer means of doing the work Weiss undertook to do. Let us suppose that instead of furnishing ladders, as was done, a scaffold had been erected and used and the plaintiff, reversing his position, had complained that defendant was negligent in not furnishing ladders, would any one contend that such failure constituted a defect in the ways, works, machinery and plant? Unquestionably not. The principle is the same in the present case. Again, if the failure to furnish a scaffold was a defect within the meaning of the statute, all the evidence shows that at defendant's furnace, Weiss, himself, was the person who was intrusted with the duty of seeing that the ways, works, machinery and plant were in proper condition. The general charge requested by defendant on this count should have been given. With these views, it is unnecessary to consider in detail the several charges given and refused.

There are many exceptions to the admission and rejection of evidence. Many of them relate to testimony tending to show the office and duties of foundrymen and master-mechanics and their relation to and authority over each other, in furnaces generally. We think in the effort of the plaintiff to establish the allegations of the complaint in respect of the duties and authority of Thompson and Weiss, respectively, it was competent to prove the duties and authority usually exercised by persons holding similar positions in furnaces generally. Such proof would raise the presump-

tion that the foundryman and master-mechanic in defendant's furnace were invested with similar duties and authority, casting the burden on defendant of showing that different regulations prevailed at defendant's furnace. Such countervailing proof, satisfactory to the jury, would overcome the presumption, and the rule at furnaces generally, different from that at defendants, would become immaterial. What we have said will serve to solve all of that class of exceptions.

The witness Middleton was shown to be possessed of sufficient knowledge of the subject to testify that some men can stand more gas than others.

The court erred in refusing to permit defendant to prove by witness Thompson that he and Weiss had had several conversations several days (perhaps as far back as two weeks) before the accident about the gas escaping from the bleeder and that Weiss knew it. So also, it was competent, to show his skill and experience, to prove a statement made by Weiss to Thompson as to how long he had been in the furnace business.

It was not objectionable for plaintiff to ask witness Thompson if he took any precaution to keep the gas from going up.

The court erred in refusing to permit witness Thompson to testify that Weiss said to him several times within two weeks or a month before the accident that he, Weiss, could not sleep well on account of the noise of the bleeder. There was no principle of *res gestæ* involved, as seems to have been supposed. The evidence was competent to show that Weiss knew of the defect in the bleeder and purposed to fix it, and in support of defendant's contention that he, of his own accord, without orders from Thompson, undertook to repair the bleeder.

The court erred in excluding the statement of witness Hogsett, that Weiss told him the first time the furnace stopped he was going to fix that lever, that it was blowing so he could not sleep.

The judgment of the City Court is reversed, and the cause remanded.

Reversed and remanded.